UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN STEPHEN HAZELL, JR., an individual, and C.H., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation; and JOHN DOES 1-10, individuals,<br><br>Defendants. | Case No.  2:23-cv-00474-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are cross-motions for summary judgment (Dkts. 23, 24) and Plaintiffs' Motion to Amend Complaint to Allege Punitive Damages (Dkt. 25). The Court heard oral arguments on February 20, 2025. At the close of that hearing, the Court issued an oral ruling that (1) granted summary judgment for Defendant on the claims of negligence per se and intentional infliction of emotional distress; (2) dismissed the loss of consortium claim with leave to amend; (3) denied summary judgment for either party on the claim of negligence; and (4) denied Plaintiff's request to allege punitive damages. The Court now issues this written opinion to address in more detail several novel legal questions raised in this action.

## BACKGROUND

This case concerns an interaction between Adam Bennett and a BNSF

Railway police officer, Daniel Mattson, in February 2022. Special Agent Mattson briefly detained Bennett for stealing a ride on a railcar and released him with a citation for trespassing. Roughly two hours later, Bennett murdered Dennis Rogers after setting fire to his barn. Plaintiff John Hazell, who was driving by, saw the fire and rushed to provide aid. Bennett fired on Mr. Hazell and seriously injured him. Bennett is now incarcerated for life.

Mr. Hazell and his minor daughter, C.H., brought this lawsuit against BNSF Railway, asserting claims for negligence, negligence per se, loss of consortium, and intentional infliction of emotional distress. Each claim depends on the assertion that SA Mattson had a duty to arrest Bennett, rather than simply citing him. For this reason, the Court will describe in some detail the encounter between Bennett and SA Mattson.

Around 5:00pm, SA Mattson responded to reports that a man was attempting to steal a ride on a BNSF train. When he arrived at the railcar, he and Bennett quickly recognized each other. Bennett had a history of similar offenses and was the subject of an active BNSF theft/burglary investigation for an incident several months prior. SA Mattson also knew that Bennett had recently been released from jail for "substantial" theft in Spokane. *Pl.'s Statement of Facts* ¶¶ 3, 5, Dkt. 24-2.

Bennett immediately asked if he was going to be arrested. SA Mattson responded by asking if he had a warrant out. Bennett initially indicated that he had

one in Idaho but then said that it might be out of Washington. After a brief back and forth about the warrant, SA Mattson said, "I'm not taking you to jail unless you have some kind of crazy warrant that mandates me." When Bennett asked what he meant by "crazy warrant," SA Mattson asked, "[a]re you, you know, a murder or anything." At around this point, SA Mattson placed Bennett in handcuffs, a decision he described as "for our safety." *Id.* ¶¶ 3-4.

SA Mattson then contacted the Kootenai County Sheriff's Office for further information about Bennett. Dispatch stated that Bennett was a "wanted person with violent tendencies" but became confused about the source of the warrant. After initially saying it was in Idaho, dispatch stated, "Oh, no, no, it's –." SA Mattson interrupted and said, "Washington?" Dispatch agreed. In reality, the warrant was out of Washington County, Idaho. *Andrew Mitchell Dec., Ex. B* at 3, Dkt. 23-3; *see Andrew Chambers Dec., Ex. 8*, Dkt. 24-3. Dispatch additionally said that Bennett had several protection orders against him. *Pl.'s Statement of Facts* ¶ 5, Dkt. 24-2.

In short, SA Mattson knew that Bennett had a significant history of property offenses, "violent tendencies," protection orders against him, and a warrant apparently out of Washington. Though somewhat erratic, Bennett generally acted calm and cooperative during the encounter.

Another consideration for SA Mattson was that the Kootenai County Jail had a special booking procedure due to COVID-19, implemented to avoid jailing

MEMORANDUM DECISION AND ORDER - 3

people for minor non-violent offenses. Under the policy, if a misdemeanor arrestee met the criteria for COVID-19 testing, the arresting officer was "asked if a cite and release is feasible." If the arresting officer declined, the watch commander would then contact the on-call prosecutor to inquire about releasing the defendant without bail. This step could be bypassed only if the charges were violent and the arrestee posed "an immediate risk to the public." *Mitchell Dec., Ex. C.*, Dkt. 23-3.

At approximately 5:40 p.m., SA Mattson let Bennett go with a citation for trespassing, after warning him that "[i]f we find you again, next time you're gonna go to jail." *Pl.'s Statement of Facts* ¶ 7, Dkt. 24-2. Dennis Rogers' farm was about a mile from where Bennett was released. At around 7:30 p.m., Bennett began his shooting and arson spree. He was arrested that night by the Kootenai County Sheriff's Office and eventually pled guilty to charges including second degree murder and aggravated assault.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims" and thereby prevent these matters "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327

(1986). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Rather, the dispute must concern a material fact— one "that may affect the outcome of the case." *Id.* at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The moving party need not introduce any affirmative evidence but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the non-moving party to produce evidence sufficient to support a favorable jury verdict. *Deveraux*, 263 F.3d at 1076. The non-moving party must show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. This requires identifying "specific, triable facts"; the Court need not "comb through the record to find some reason to deny a motion for summary judgment." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003). All evidence must be viewed in the light most favorable to the non-moving party, but the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

# ANALYSIS

This case raises novel legal questions about the powers and duties of railroad police officers. The Court now issues this written opinion, following the February 20, 2025, oral ruling, to address these undeveloped areas of law. The subsequent analysis discusses (1) whether a railroad police officer in Idaho has a statutory duty to arrest for an outstanding warrant; (2) whether a railroad police officer has the legal authority to execute a warrant; and (3) the circumstances under which a "special relationship" gives rise to a duty to arrest. On the remaining issues, the Court explained its reasoning at the hearing and will not opine further here.

### 1. Duty to Execute Warrant

Mr. Hazell's negligence per se claim hinges on the assertion that a railroad police officer has a statutory duty to arrest an individual known to have an outstanding warrant. The Court concludes that a railroad police officer has no such duty.

A peace officer in Idaho must perform an arrest in certain circumstances, including when an individual has an outstanding warrant. This is a rather unintuitive interpretation of the relevant statute, which provides that "[a] peace officer *may* make an arrest in obedience to a warrant delivered to him. Idaho Code § 19-603 (emphasis added). Nonetheless, the Idaho Supreme Court has long held that "the existence of a valid arrest warrant imposes a duty on peace officers to

make an arrest." *State v. Cohagan*, 404 P.3d 659, 664 (Idaho 2017) (citing *Monson v. Boyd*, 348 P.2d 93, 95 (Idaho 1959)).

This raises the threshold question of whether railroad police officers are "peace officers" within the meaning of Idaho statute. They are not. The Idaho Code defines "peace officer" as "a sheriff *of a county*, or a constable, marshal, or policeman *of a city or town*." § 19-510, (emphasis added). By comparison, a railroad police officer is separately defined in the very next section of the Code, which provides that the governor may appoint "any person designated by such [railroad] company to serve at the expense of such company as policeman, with the powers of a police officer, and who, after being duly sworn, may act as such policeman upon the premises, cars or boats of such company." § 19-511. These contrasting definitions make clear that a peace officer must be a public employee—a law enforcement officer of a county, city, or town. Although § 19-511 grants railroad police officers some of the same powers within the railroad's limited jurisdiction, the duty to execute a warrant is specifically tied to a peace officer's status as an agent of the state by § 19-510 and does not extend to railroad police officers.

As a result, it is irrelevant for purposes of this analysis whether SA Mattson knew, or should have known, that Bennett had a warrant from Idaho rather than Washington. Even if dispatch had provided accurate information, Bennett would

not have been obliged by the statute to perform an arrest because he is not a peace officer. This conclusion is fatal to Mr. Hazell's negligence per se claim.

### 2. Authority to Execute Warrant

Moreover, SA Mattson would not even have the *authority* to execute the arrest warrant, which concerned an offense with no connection to the railroad. The statutes and regulations governing railroad police officers impose strict limits on their authority and do not allow for that sort of general law enforcement activity.

Railroad police officers are a unique statutory creation with restricted powers that reflects their special function. To meet a railroads' distinct, interjurisdictional policing needs, 18 U.S.C. § 28101 provides:

> A rail police officer . . . may enforce the laws of any jurisdiction in which the rail carrier owns property, to the extent of the authority of a police officer certified or commissioned under the laws of that jurisdiction, to protect (1) employees, passengers, or patrons of the rail carrier; (2) property, equipment, and facilities owned, leased, operated, or maintained by the rail carrier; (3) property moving in interstate or foreign commerce in the possession of the rail carrier; and (4) personnel, equipment, and material moving by rail that are vital to the national defense.

This intersects with Idaho's railroad officer provision, which allows the governor to appoint individuals designated by the railroad company "to serve at the expense of such company as policeman, with the powers of a police officer, and . . . act as such policeman *upon the premises, cars or boats of such company*." Idaho Code § 19-511 (emphasis added). In other words, the governor may delegate Idaho's law

enforcement authority to officers of the railroad company, but only on railroad property and for the sole purpose of protecting the railroad.

Federal regulations set out in 49 C.F.R. § 207 further emphasize the limited scope of these powers. A railroad officer is "directly employed by or contracted by a railroad to enforce state laws *for the protection of railroad property, personnel, passengers, and/or cargo*." § 207.2(a) (emphasis added). Another subsection elaborates that

> a railroad police officer may enforce *only* relevant laws for the protection of—
> i. The railroad's employees, passengers, or patrons;
> ii. The railroad's property or property entrusted to the railroad for transportation purposes;
> iii. The intrastate, interstate, or foreign movement of cargo in the railroad's possession or in possession of another railroad or non-rail carrier while on the railroad property; and
> iv. The railroad movement of personnel, equipment, and materials vital to the national defense.

§ 207.5(b) (emphasis added).

Reading all this together indicates that a railroad police officer only has the authority to enforce laws to the extent that they pertain to the railroad. *See Chartock v. Amtrack*, No. 14-2327, 2015 WL 5584328, at *5 (E.D. Pa. Sept. 21, 2015). For instance, SA Mattson could not have arrested someone for a traffic violation on a highway near the railroad, or for shooting another individual on non-railroad property, unless these actions somehow threatened the railroad. Likewise, he could not execute an arrest warrant unrelated to a crime on or against railroad

MEMORANDUM DECISION AND ORDER - 9

property. Although the caselaw on railroad police officers is quite limited, the Court has found no authority in any jurisdiction indicating that an officer like SA Mattson had broader power, let alone responsibility, to enforce Idaho's laws.

This does not, however, foreclose Mr. Hazell's argument that SA Mattson had a common law duty to arrest Bennett, which is discussed next.

### 3. Special Relationship Doctrine

Mr. Hazell argues that, even in the absence of a statutory obligation, SA Mattson had a duty to arrest Bennett based on information indicating that Bennett posed a potential threat to the public. Although SA Mattson lacked the authority to execute the warrant, he did have discretion to arrest, rather than cite, Bennett for trespassing. The question is whether the failure to do so breached a legal duty. On this, there is a material factual dispute.

"The general rule under Idaho law is that a person has no duty to prevent a third party from causing physical injury to another." *McGlocklin v. United States*, 849 F. Supp. 756, 764 (D. Idaho 1994); *see Olguin v. City of Burley*, P.2d 255 (Idaho 1991); *Lundgren v. City of McCall*, 817 P.2d 1080 (Idaho 1991). But an important exception arises when the actor and the third party have a "special relationship . . . which imposes a duty upon the actor to control the third person's conduct." *McGlocklin*, 849 F. Supp. at 764. As this Court explained in *McGlocklin*:

> This special relationship can arise where a person takes charge of an individual having dangerous propensities: "One who takes charge of a

third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

*Id.* (quoting *Restatement (Second) of Torts* § 319). In other words, this duty to control applies when an actor (1) takes charge of a third person, and (2) knows or should know that the third person is likely to cause bodily harm to others if not controlled.

*McGlocklin* stemmed from a home invasion and shooting that occurred near the Canadian border. The victim, Robert McGlocklin, sued the United States, arguing that customs officials were negligent in allowing the shooter, Robert Adams, to pass through the port of entry. *Id.* at 757. Shortly before the shooting, Adams had attempted to cross the border using false identification documents. *Id.* at 759. After being referred for additional inspection, he briefly took a customs officer hostage at gunpoint then fled the scene. *Id.* at 760-61. Shortly after that, Adams arrived at McGlocklin's home, broke in, and shot him.

Following a bench trial, the Court ruled that the customs officers were not negligent because they neither "took charge" of Adams nor had reason to think that he was likely to harm others. On the first element, "[a]lthough Adams was required to submit to a secondary inspection, there was no established, custodial-like relationship existing between the customs officers and Adams." *Id.* at 764. On the second, "the customs officers suspected Adams was attempting to cross the

border with false or stolen identification, but did not have reasonable basis to suspect him to be armed or potentially dangerous because people occasionally attempted to cross the border with false or stolen identification." *Id.* at 760. Accordingly, the Court concluded, "there was no 'special relationship' created or existing between the customs officers and Adams so as to give rise to a duty of care." *Id.* at 764.

Here, in contrast, SA Mattson unambiguously "took charge" of Bennett by detaining him. Bennett was handcuffed and placed in the police car—a "custodial-like relationship." Therefore, a duty of control arose to the extent that SA Mattson knew, or should have known, that Bennett would otherwise likely cause bodily harm to others. On this, there is a material question of fact. Bennett's underlying offense—trespassing on the railcar—does not in itself create an inference of violence, but SA Mattson also knew that Bennett had an outstanding warrant, "violent tendencies," and several protection orders. If SA Mattson should have concluded from this history that Bennett would likely commit acts of violence upon release, he had a duty to take reasonable care to prevent this harm—for instance, by arresting Bennett for trespassing rather than issuing a citation.

Although SA Mattson's actions must not be judged with the benefit of hindsight, the record establishes a genuine dispute of material fact regarding the alleged breach of the duty of control. It will be the responsibility of the jury to

determine what SA Mattson should have known or should have done. The Court therefore denies summary judgment for either party on the negligence claim.

## ORDER

**IT IS ORDERED that:**

1. Defendant's Motion for Summary Judgement (Dkt. 23) is **GRANTED IN PART and DENIED IN PART** as follows:

    a. Summary judgment is **granted** on the claims of negligence per se and intentional infliction of emotional distress.

    b. The claim of loss of consortium is **dismissed with leave to amend**.

    c. Summary judgment is **denied** on the claim of negligence.

2. Plaintiffs' Motion for Summary Judgment Re. Liability (Dkt. 24) is **DENIED**.

3. Plaintiffs' Motion to Amend Complaint to Allege Punitive Damages (Dkt. 25) is **DENIED**.

DATED: March 24, 2025

_____
B. Lynn Winmill
U.S. District Court Judge